IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| TBAG HOLDINGS, INC., | § | CASE NO. 21-30266 |
| DEBTOR | § | (CHAPTER 11) |

### DECLARATION OF J. CHRISTOPHER BAUGHMAN IN SUPPORT OF DEBTOR'S CHAPTER 11 PETITION AND FIRST DAY RELIEF

I, J. Christopher Baughman ('Baughman"), pursuant to Section 1746 of Title 28 of the United States Code, hereby declare that the following is true and correct to the best of my knowledge, information and belief:

### INTRODUCTION

1. I am the President and a shareholder of TBAG Holdings, Inc., the Chapter 11 debtor and debtor-in-possession ("Debtor" or "TBAG"). My wife, Mary Lou Baughman, is the other 50% shareholder. I am familiar with the day-to-day operations, business, and financial affairs of the Debtor.

2. I submit this declaration (the "Declaration") to assist the Court, creditors and other parties in interest in understanding the circumstances that compelled the filing of this Chapter 11 case on January 28, 2021 (the "Petition Date") and in support of: (a) the Debtor's petition for relief under Chapter 11 Subchapter V of Title 11 of the United States Code (the "Bankruptcy Code"), filed in the United States Bankruptcy Court for the Southern District of Texas, and (b) the relief requested in the emergency motions and applications filed by the Debtor (collectively, the "First Day Motions").

3. The First Day Motions seek relief intended to preserve the value of the Debtor and maintain continuity of operations by, among other things, (i) preserving the Debtor's relationships with its customers, vendors, suppliers, and employees; (ii) ensuring continued employee morale; and (iii) establishing certain administrative procedures to facilitate an orderly transition into, and uninterrupted operations throughout, this Chapter 11 Case. This relief is critical to the Debtor's efforts to reorganize.

4. Except as otherwise indicated, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by the Debtor's counsel, or my opinion based upon experience, knowledge and information concerning the operations of the Debtor. If called upon to testify, I would testify competently to the facts set forth in this Declaration. I am authorized to submit this Declaration on behalf of the Debtor.

## BACKGROUND
### History of TBAG Holdings, Inc.

5. TBAG is a Texas Corporation, formed in July 1998 and duly authorized to conduct business in the state of Texas. TBAG's principal place of business and mailing address 1812 FM 359 Road, Richmond, Texas 77406-1296. Since inception, TBAG has owned and operated a Dry Clean Super Center at its principal place of business (the "Dry Cleaner"). The Dry Cleaners is TBAG's only business.

6. TBAG was formed as a result of a turnkey agreement with Kwik Industries ("Kwik") to operate as Dry Clean Super Center. The Dry Cleaner opened November 1, 1998 and my dream of owning my own business became a reality. In connection with the purchase, TBAG entered into a Promissory Note with Amresco Independence Funding, Inc. ("Amresco") (the "Amresco Promissory Note") for $870,000 and a Note with Kwik for $80,284.00 (the "Kwik Note I"). The Amresco Promissory Note was secured with a Deed of Trust and the Kwik Note I was secured with a Second Lien Deed of Trust.

7. The Dry Cleaners is in a free standing building and is a full production, on site dry cleaning and laundry plant as well as specialty services such as alterations and shoe repair. Business is transacted by customers dropping off clothes for us to clean and process. Payment is accepted from the customers when they drop off and/or when they pick up their cleaned, pressed, and bagged clothes. The Dry Cleaner has been owned and operated by me and my wife since our opening date in 1998 and we have been committed to providing excellent quality and service at a low price. We are not just about the Dry Cleaners as we have continually invested in our local community, making financial donations to local causes and by volunteering our time.

**EVENTS LEADING TO BANKRUPTCY**

8.   In 2004 Kwik representatives came to me and asked if I would be interested in "helping them out" by acquiring, with Kwik's financial assistance, an operation that the current owner wanted to vacate. Kwik indicated that it would be building him a new cleaning plant close to his residence and they needed to put a new owner in his current Missouri City location. The way the proposal was presented, it seemed like a win-win situation. I could acquire another location with significant assistance from Kwik and the current owners would get a location closer to home. At that point, I formed another company, Heights DCSC Ltd. ("Heights") to own and operate the new dry cleaners (the "Missouri City Location"). In the end, the new cleaning plant was never built for the prior owner but I bought the Missouri City Location with Kwik's coordination with BLX Capital, LLC ("BLX")[1]. As part of the purchase of the Missouri City Location, TBAG paid off the Amresco Promissory Note and entered into a $825,000 Promissory Note with BLX ("TBAG BLX Note") which was secured with a Deed of Trust (First Lien). The TBAG BLX Note was an SBA guaranteed Loan. Additionally, TBAG entered into a $180,000 Real Estate Lien Note ("Kwik Note II") and a Deed of Trust (Third Lien) with Kwik. Finally, TBAG, my wife and I all personally guaranteed the TBAG BLX Note.

9.   From the outset the Missouri City Location was not profitable. The financial information which was presented to me seriously overstated - or outright misrepresented - the prospects for the Missouri City Location. Additionally, upon information and belief, the Missouri City Location's prior owner failed to property dispose of the perc cleaning solvents.

10.   Because of the Missouri City Location's failure to operate profitably, over the years TBAG advanced money to Heights. Heights was unable to generate sufficient revenue to regularly make its mortgage payments and ultimately it was unable to pay even its property taxes.

11.   Because of Heights failure to make payments, in 2014, BLX (on behalf of US Bank) filed suit against Heights, TBAG, me and my wife. In 2016, BLX obtained a Judgment for $1.1 million against all of the defendants. However, aside from various attempts to negotiate payment

---

[1]   BLX provided financing for the purchase of the Missouri City Location also. The Heights Note is referred to as the Heights BLX Note. The Heights BLX Note and the TBAG BLX Note are currently serviced by Lendstream Small Business Finance and/or Ciena Capital Funding LLC.

arrangements and requesting post judgment discovery, BLX has not pursued collection of the judgment.  In particular, it never posted the property for foreclosure.

12.     While better operationally, TBAG was not able to sustain itself and make up the Missouri City Location deficiencies.  While Kwik held various notes against Heights and TBAG, Heights never paid on its notes and TBAG has not paid Kwik on its notes in more than fifteen (15) years.

13.     Like all businesses, TBAG was severely injured when the worldwide pandemic hit. We lost 60-70% of our business overnight by mandatory shutdowns.  While the Dry Cleaners has reopened, we have only recovered 10-15% of our normal revenue.  As part of the government assistance, we were able to acquire a small Economic Injury Disaster Loan but because of Heights failure to pay the Heights BLX Note (which was also an SBA guaranteed loan), TBAG was not eligible for the Paycheck Protection Program.

14.     TBAG ceased making payments on the TBAG BLX Note.  However, we have tried to keep people employed and to pay operating expenses.  With the assistance of counsel, we attempted to an out-of-court arrangement with BLX that would resolve the payment issues and the various Heights related issues.  Because the loans are all SBA guaranteed, BLX was unable to put forth an agreement which would completely resolve TBAG's various issues.

15.     Because of non payment, BLX noticed the Dry Cleaners property for February foreclosure.  This case is filed to stop the foreclosure, allow TBAG to reorganize, eliminate the subordinate Kwik liens and address the various other issues which resulted from its guarantee of the Heights loans.

16.     The Debtor's current plan is to continue to operate the Dry Cleaner and use operations to fund a reorganization.  The Debtor anticipates that with modified and reduced secured debts and reduced monthly payments, TBAG will be able to fund a plan of reorganization.

**FIRST-DAY MOTIONS**

17.     The Debtor has filed a number of First-Day Motions.  Generally, the First-Day Motions have been designed to meet the immediate goals of: (a) maintaining and protecting the Debtor's assets; (b) establishing procedures for the efficient administration of the case; (c)

continuing the Debtor's operations during this case with as little disruption and loss of productivity as possible; and (d) maintaining the confidence and support of vendors, customers, employees, and other key constituencies.

18. I have reviewed each of the First-Day Motions, including the exhibits thereto, and I believe that the relief sought in each of the First-Day Motions is narrowly tailored to meet the goals described above and, ultimately, will be critical to the Debtor's ability to achieve success in the Chapter 11 Case.

19. The First-Day Motions are identified and more fully described below.

A. EMERGENCY MOTION TO AUTHORIZE PAYMENT OF PRE-PETITION EMPLOYEE COMPENSATION

20. In order to enable the Debtor to retain current employees (the "Employees") during this critical time, minimize the personal hardship such Employees may suffer if pre-petition employee-related obligations are not paid when due, or honored as expected, and maintain morale, the Debtor, by its Emergency Motion to Authorize Payment of Pre-Petition Employee Compensation (the "Employee Motion"), is seeking authority to pay, (a) the pre-petition compensation as detailed in the Employee Motion and (b) all pre-petition federal and state withholding obligations. The Debtor further requests that the Court enter an order directing all banks to honor the Debtor's pre-petition checks or electronic transfers for payment of the foregoing, and prohibiting banks from placing any holds on, or attempting to reverse, any automatic transfers on account of the foregoing.

21. The Employees are essential to the continued operation of the Dry Cleaner and the Employees' morale directly affects their effectiveness and productivity. Consequently, it is critical that the Debtor continue, in the ordinary course, its personnel policies, programs, and procedures that were in effect prior to the Petition Date. If the pre-petition compensation payments are dishonored, or if such obligations are not timely paid post-petition, the Employees may suffer extreme personal hardship and may be unable to pay their daily living expenses. A loss of employee morale and goodwill at this crucial juncture would undermine the Debtor's stability, and undoubtedly would have a negative effect on the Debtor, its estate, the Debtor's customers, the value of its assets and business, and the ability to achieve its objectives in Chapter 11.

B.     *EMERGENCY MOTION FOR INTERIM AND FINAL USE OF CASH COLLATERAL BY DEBTOR*

22.     Pursuant to the Emergency Motion for Interim and Final Use of Cash Collateral by Debtor (the "Cash Collateral Motion"), the Debtor is seeking authority for the use of Cash Collateral. It is essential to the Debtor's post-petition operations, the maintenance of the value of the Dry Cleaner, that it uses Cash Collateral. The Cash Collateral will only be used to pay for expenses that are set forth in a budget attached to the motion. Such expenses include, but are not limited to, employee payroll and other benefits, supplies and other expenses related to operating the Dry Cleaner.

23.     The reasons supporting the Debtor's use of Cash Collateral are compelling. The Dry Cleaner is paid for services by cash or credit card. As a result, it does not have accounts receivable. Continued use of the Dry Cleaner's assets will not significantly diminish the value of Lender's collateral (as defined in the Cash Collateral Motion). Use of Cash Collateral is required to fund the day-to-day operating expenses of the Dry Cleaner, including payments to employees and purchase of supplies, as well as reorganizational expenses necessary to maintain the value of the business. Unless this Court authorizes use of the Cash Collateral, the Debtor will be unable to operate and maximize the value of the Dry Cleaner and its bankruptcy estate. Indeed, absent sufficient funds to support the business, the Debtor will have to cease operations. Therefore, authorization to use Cash Collateral pending the Final Hearing is in the best interests of the Debtor's bankruptcy estates and creditors.

24.     In exchange for the use of Cash Collateral, as adequate protection for the use of the Cash Collateral, the Debtor proposes to grant to Lenders replacement liens in the form of security interests and liens upon the same types and kinds of assets upon which it held a pre-petition lien, subject only to valid, perfected, and enforceable pre-petition liens (if any) which are senior as of the Petition Date. The grant of replacement liens will only apply to the extent that the pre-petition Collateral was encumbered by valid and perfected liens and security interests (collectively, the "Replacement Liens"). The Replacement Liens will not attach to any avoidance actions under Chapter 5 of the Bankruptcy Code.

C.  **EMERGENCY MOTION FOR ORDER AUTHORIZING DEBTOR TO FURNISH CASH DEPOSIT FOR ADEQUATE ASSURANCE OF PAYMENT FOR FUTURE UTILITY SERVICES**

25. Under the Bankruptcy Code, a Debtor must provide a Utility company "adequate assurance of payment" within thirty (30) days of filings its bankruptcy petition. The Emergency Motion for Order Authorizing Debtor to Furnish Cash Deposit for Adequate Assurance of Payment for Future Utility Services provides a procedure whereby the Debtor proposes to pay each utility company an amount equal to an average month's invoice. If the utility company disagrees with the amount proposed, the utility company may make an "Additional Assurances Request." If the Debtor and the utility company are not able to reach an Agreement on whether additional assurance is required, the utility company may file a "Determination Motion" whereby the Court will determine the amount necessary to provide adequate assurance of payment.

26. The procedure sought by the Debtor is consistent with the objectives of §366 of the Bankruptcy Code, and also allows an orderly process for determining the amounts necessary to provide adequate assurance of payment. Further, uninterrupted utility service is crucial to running and maintaining the Debtor's business. Dry Cleaner patrons understandably expect a Dry Cleaner to have all necessary utility services.

Pursuant to 28 U.S.C. § 1746, I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: January 29, 2021

_____
J. Christopher Baughman, President

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing pleading has been served on the parties listed on the attached service list by ECF filing, email or first class mail on January 29, 2021.

By: _/s/ John Akard Jr_
**JOHN AKARD JR.**